And as you've already been surprised, we're going to try and give counsel in the case of these two cases three minutes to begin their argument before we jump in. Just by way of warning, we sometimes forget, and if we do and jump in too early, just go with the flow. But we will try and give you your three minutes. The first case is Tolino v. City of New York, and I believe we're ready to proceed. Okay, good morning. This is Stephen Bergstein for the plaintiff appellant, Michelle Tolino. The plaintiff's constructive discharge claim under the New York City Human Rights Law should have been resolved by a jury. It should not have been resolved by the district court on a motion for judgment as a matter of law. We have a threshold issue, which is the legal standard for constructive discharge claims under the New York City Human Rights Law. Since that issue is not settled in the New York appellate courts, we ask this court to certify that issue to the New York Court of Appeals. And I draw this court's attention to a Rule 28J letter that I sent last week about a ruling from the second department that reiterated what I just said about the lack of clarity on the legal standard for a case like this under the city law. Turning to the merits, what is the evidence of constructive discharge, bearing in mind that the issue was taken off the table mid-trial when the judge granted Rule 50A relief? The plaintiff's supervisor sexually harassed her for more than six years. Management was aware of the harassment. Plaintiff had complained about it, and management had conducted a deficient internal investigation. And while the agency said the investigation could not corroborate the allegations, a federal jury ruled that the hostile work environment did happen, awarding plaintiff a seven-figure damages award. So, with that background in mind, after the agency's investigation ended, plaintiff met with two agency officials, Sarah Crafts and Daniel Schwartz, and at this meeting they said to plaintiff the following. Number one, your complaint of sexual harassment has offended the agency. Page 227, quote, go back to Shehzad Ali or you have no place here. That's page 227. Ali is the man who harassed the plaintiff. And plaintiff testified on cross-examination that Schwartz told plaintiff that she would be fired if she tried to leave her current position. So this ultimatum meeting took place after the agency retaliated against plaintiff for filing the internal sexual harassment charge that the jury found on plaintiff's favor on the retaliation claim as well. So if the jury credits this testimony, it could find that management drove plaintiff from the workplace because of her gender, and that plaintiff had no choice but to resign to avoid working any further for Mr. Ali, who had sexually harassed her for six years. And the district court, in its post-trial Rule 50B ruling, essentially made a credibility assessment as to the believability of plaintiff's testimony at the ultimatum meeting, claiming that it had limited evidentiary value because plaintiff was not purporting to give a verbatim account of what Schwartz or Crafts said, but simply her impression of what they meant to convey. And I really haven't seen language like that in a federal decision before, but this is the type of over-analyzation of a plaintiff's trial testimony that is prohibited under this court's precedence, including Rivera v. Rochester Genesee Transportation Authority, which we cite in our reply brief. The plaintiff did not indicate that she was giving her impression of what was told to her at the ultimatum meeting. She simply testified the way witnesses often testify. I went to a meeting, and this is what they told me. And if the jury credits that, and they could, then they could find that management was giving her no choice but to leave the agency. The district court also tried to put the ultimatum statement in context. The district court said that defendants may have said this because plaintiff was unwilling to relocate to another part of the agency. That's actually not true. We developed our response to that in our reply brief. But the record shows that plaintiff was far more flexible in accepting alternate working assignments than the district court was suggesting. She testified at trial. Can I interrupt just for a moment and ask you to address the certification question a little bit more fully? We have this appellate division decision in Crockendale, and we don't really have a contrary decision from the state courts. So I'm wondering whether there really is enough ambiguity or complexity here to justify a certification. Well, Crockendale follows an earlier First Department case, Simmons-Grant, where they have a footnote saying, don't assume that constructive discharge under Title VII is the same standard as city law. I recognize what Crockendale said, but they didn't seem to address that issue or attempt to analyze the constructive discharge standard under the more remedial statutory construction mandated by the city law. But more recently, last week, the Second Department said the same thing in a footnote in Golston Green that, quote, we recognize that the appellate courts have not yet explored the contours of the constructive discharge frame using the enhanced liberal construction analysis of the city human rights law. So the state of the law under the city law for constructive discharge seems uncertain at the moment. How is it uncertain? We know what the standard is. They just haven't decided that the legislative history that you referenced with regard to the city council somehow alters that. But they have recognized, haven't they, that where the constructive discharge arises out of a hostile work environment frame, that obviously the constructive discharge has to be something more than just a hostile work environment, doesn't it, in terms of proof? It has to be even more hostile than that which would be necessary to satisfy the hostile work environment, doesn't it? Sure, but we don't know how. Does that just make sense? That would be, you know, if I were to have... You're not arguing that the minimal amount of proof to satisfy a hostile work environment also satisfies the constructive discharge? No, I don't think the New York Court of Appeals would adopt that. You're conceding that it has to be different and that the constructive discharges have to be something more because someone could continue to work in a hostile work environment and have a claim, wouldn't they? Sure, but I think the difference would be... So then to leave, to be compelled to leave, a reasonable person being compelled to leave, has to be a hostile work environment plus. And isn't that what the standard is now? But the difference between the city law and Title VII, if the New York Court of Appeals were to ask me what should the difference be, what should the jury charge look like, I would say the language under Title VII with an intolerable work environment wouldn't apply under the city law. What standard would you apply? I would have the jury determine if a reasonable employee under the circumstances would feel compelled to resign because of unlawful discrimination or retaliation. Now that might be more than your routine hostile work environment, but... Which I think you have to. I agree with you there. That introduces something more than just a hostile work environment, doesn't it? Correct, but the Title VII wants the work environment or the work situation to be intolerable, where you're at an absolute breaking point. Well, it's so intolerable that... Well, but that's not the rest of it. The rest of it is we're still compelled to resign. Right. The district court in this case thought that the standard you were proposing is materially identical to the Title VII standard because you said that it's conditions that would compel somebody to resign in other circumstances. So could you just explain exactly how, in the context of your case, you could make out a claim under the more liberal construction that you couldn't under the federal construction? Sure. Using that formulation, a reasonable employee would feel compelled. On our facts, the plaintiff has no choice but to leave. We know that the harassment she suffered caused her to suffer post-traumatic stress, serious anxiety, and she could not work for somebody, again, who had harassed her for six years. Is the difference between the liberal construction and the federal standard, in your view, that one is objective, but under the liberal standard, she'd be able to make out a claim based on subjective impact? What is the difference in standard that allows you to prevail, whereas you couldn't prevail under the harsher federal standard? The city standard would be more relaxed than the federal standard, which is very difficult to satisfy under this court's cases. There's maybe only four or five cases out of the Second Circuit in the last 25 years where somebody survived a motion for judgment as a matter of law. It's really a breaking point standard. The city law, in every circumstance—we know this from the statutory construction that's codified in the statute—in every circumstance, the city law has to be interpreted differently than Title VII in a more pro-plaintiff way. It can't be the intolerable standard where you're almost literally pushed out of the workplace. I agree it has to be something more enhanced than your typical sexual harassment case, but I think we satisfy that here because they're telling her she has to go back to the man who harassed her. If we agree that the statutory construction under the city law requires that everything has to be interpreted differently, we can't use the Title VII standard. We can't. And the footnotes in the first department and the second department, which are the only departments that interpret the city— So is your view that requiring her to go back to her harasser would not pass muster under the federal standard, but under the city standard or your proposed city standard because it doesn't have to be objectively intolerable, that would be enough to force her to leave? Requiring her to go back to Ali would satisfy the federal standard. I do believe it would satisfy the federal standard because she can't work for this guy anymore, and if he's given the green light to harass her again because the agency cleared him and didn't quote-unquote corroborate her allegations, knowing what we know about her mental state and what he did to her and how the jury saw the evidence and the jury believed her, I think even if the New York Court of Appeals applies the federal standard, we have enough to show constructive discharge. What I'm suggesting— Okay, so then how is this question about the standard, how is it outcome determinative? Why should we certify the question if you're saying it wouldn't make a difference because the conduct that you're alleging would satisfy the federal standard anyway? Because if the city standard is going to be different from the federal standard, then it's going to affect the jury instruction, and the jury may not be given the nearly insurmountable legal standard that applies to Title VII. It'll be something else, and that's the reason the New York Court of Appeals should hear this. We can't assume that she would win under Title VII standard. I think she could, but we can't assume she would, but she has a better chance of winning under the— I wish—hang on just a minute. Whoever's phone is not muted, please mute your phone. I muted everything in my office. I'm not talking about you. Mr. Berksley, let me ask you one quickly because I don't want to take up all your time. Judge Rakoff said that you didn't even meet the lesser standard, and let me ask you, when your client testified about the other positions that she was offered, she said—she indicated that she didn't think they were comparable. Did she discuss, or is there evidence in the record that shows the facts of what those other jobs were so that a jury could have decided whether they were comparable or not? Not with the level of specificity that you would think, probably because the city didn't have the opportunity to explore that issue further because it was the most rampant. Whose burden was it to show that they were comparable? It was yours. Correct. Well, she said she was— So why was it the city's problem that didn't get to explore it? You had—this was your case in chief. I would have thought that she would have gotten on the stand and testified that, well, this is really a clerical position. It's not kind of a research work that I was doing with regard to minority businesses in the past. She testified— Go ahead. —that the positions—that one of the positions offered to her was a step down, but I'm not seeing a lot of detail on that in the record. But what I can emphasize is that she was— So how was—how did she—how was the judge—how did the judge err in concluding that she hadn't met the burden of showing that, at least from the offers of alternate employment, that those were comparable or that they weren't comparable and so therefore somehow they were contributed to the constructive discharge? What the district court got wrong in that respect was the district court assumed that the plaintiff was not flexible in moving around the agency. She was willing to move around the agency, and there's evidence to that effect. It's in her memo to EEO at page 944. While she ideally wouldn't want to leave the unit, she was interested in a more permanent reassignment to another division within the agency. Schwartz testified that she would consider working in another division at the agency. She denied that they gave her the opportunity to stay in the division and that the only thing anybody said to her was, you have to go back to work for Ali. So there's an issue of fact whether she was so rigid and that she wouldn't move elsewhere in the division or whether she was flexible in being willing to move elsewhere in the division. I think there's evidence— The collateral opportunities would have involved a reduction in title, and so that's why she didn't take them. She did testify to that. She did testify. Doesn't that assume that there were other opportunities offered? Yes, and she said she was willing to consider moving elsewhere in the agency, that she was not insisting that she remain in the division. Now, there was testimony from Kraus about the position that was offered to the plaintiff. Kraus did not have details about the nature of the positions she claimed were offered to the plaintiff. So a jury can find, number one, the plaintiff was willing to move elsewhere in the division. She was open-minded about it. She wasn't insisting she stay in the division with Ali. The question is, if that's the case, why was she being given the ultimatum, you have to stay with Ali or you have no place here? That's the constructive discharge. And if a jury can find that she reasonably thinks Ali is going to resume the sexual harassment, which he probably would have, then she really has no choice but to leave. Mr. Bergstein, your time has expired. Did you want to use your rebuttal time now or would you like to reserve that? I'll reserve that for rebuttal. Okay. Thank you very much. We'll hear from Ms. Paulson. Thank you, Your Honors. May it please the Court, Susan Paulson on behalf of the City at Police. As Your Honors have recognized, certification is not necessary or appropriate in this case where there's no contrary decision from state courts and it would not be outcome determinative. Uniform state precedent has adopted the federal constructive discharge standard, which requires showing that the employer deliberately created working conditions so intolerable, difficult, or unpleasant that a reasonable person would feel compelled to resign. And here, the plaintiff failed to establish or failed to present sufficient evidence of either deliberateness or intolerableness. No reasonable jury could conclude that the city was deliberately attempting to force her to quit or chose to make things worse or so intolerable she would feel compelled to resign. At trial, the plaintiff focused on what she alleges was an inadequate EEO investigation and complaints about her work conditions, her work assignments, reduction work assignments, removal of her BlackBerry, her workstation, etc. As to the EEO investigation, she conceded that when she reported Mr. Ali's alleged untoward advances to HR, she received an immediate response. She met with HR on multiple occasions to discuss her allegations that six other employees were interviewed, but ultimately, she believes these measures were inadequate. She did not, during the course of this investigation, I note, hand over her emails that supported the finding at trial of sexual harassment. So, the EEO investigation did not include those. She believes these measures were inadequate to address her concerns, but that does not demonstrate a deliberate effort to make her work conditions so intolerable she'd be compelled to quit. The other focus was on the changes to her work conditions, and these all happened seven months before she resigned. Do you have one more minute of your initial three? Thank you. In November of 2014, on page 201 of the record, she said, was the breaking point, the culmination of everything on page 209. This is when she alleges that Mr. Ali assaulted her, something that the jury found did not occur, there was insufficient evidence, and then moved her workstation and made the other changes. This court has repeatedly held that constructive discharge cannot be shown by the fact that an employee was unhappy with the nature of her assignments or the working conditions. On reconsideration, she focused on this conversation that she alleges occurred with Krauss and Schwartz after the end of the EEO investigation. In this investigation, she says she was told she had to return to Ali or she had no place at the agency. But as your honors have recognized, she was offered opportunities to transfer other places. She was offered a transfer to the Waterfront Permits Division, a transfer to the Neighborhood Development Division. And if you look at the record at Krauss' testimony on 708, 728, and 734, you see that Krauss had said this would be a lateral transfer in a role that would be similar to the one she had. But she said that she wasn't offered those opportunities, right? Isn't that a contested fact? I mean, was it really up to the district court to weigh the evidence before submitting it to the jury and just decide that those opportunities were offered and that they were comparable? Your honor, I believe that what is contested is that they arranged interviews for her. If you look at the record on page 339 where the appellant cites, she disputes that either Schwartz or Krauss arranged interviews for her. But nowhere in the record does she specifically dispute that positions have been identified or that transfers have been offered. And I believe that appellant acknowledged as much in his opening argument. Your honor, here— Before we get into that, can I ask you a question about just the standard, which I guess is the threshold question? So the city council has said numerous times in the Restoration Act and then in Local Law 35 that the New York City human rights law needs to be given a more liberal construction that's analyzed independently from federal law. But you're here telling us that we should just adopt the federal standard. Aren't you arguing against the city's own law? Your honor, when the city council passed the law and when they made its amendments, it didn't identify constructive discharge as a claim that was too narrowly construed. It didn't single out any of the cases. So our argument essentially is that where we have uniform state precedence here and the state courts have continued to adopt and apply the federal standard, that it's not appropriate at this juncture for this court to certify the question to the New York State Court of Appeals. The State Court of Appeals is presented by New York City human rights law. The district court didn't credit the interpretation of the New York City Human Rights Commission because it doesn't pronounce authoritative interpretations of law. Do you agree with that? We should discount what the New York City Human Rights Commission has to say about the proper interpretation of the law? Well, your honor, I wouldn't say that we should discount it. I would agree with the district court that an oath decision is not controlling precedent. But I would also agree that that decision said that the standard should be whether the plaintiff was subjected to an environment hostile enough to force her to quit because of some factor prohibited by the standard. And as your honors explored with appellant here today, it's unclear how that standard was materially different. Well, I mean, if I read the New York City Human Rights Commission standard, they say explicitly that the intolerable standard is outdated because of the Restoration Act. And they say the workplace need not be so objectively intolerable to compel someone to leave, but rather can be hostile enough to force the complainant to quit because of some factor prohibited by the human rights law. So the commission seems to think that it is a different standard that makes the material difference. So I guess I'm asking, I mean, do you think we should discount what the Human Rights Commission has to say about the New York City Human Rights Law? Your honor, I think that what the New York City Human Rights Commission said should not be discounted. But I think it's the place for the state courts in applying the New York City Human Rights Law to determine whether or not that dictates a relaxation of the standard. And to date, the uniform state precedent has concluded that it does not. Although they have noted that the contours might be unclear, they have not yet interpreted it differently. I don't believe— But doesn't that just mean that it's an unanswered question? Even so, if two appellate courts have said we have yet—like the appellate courts in New York State have yet to apply the more liberal construction to a cause of action for a constructed discharge, and the cases that you're citing all apply the pre-Restoration Act standard, and the Human Rights Commission seems to think that it's different. And you're telling me now that New York State courts should look to the Human Rights Commission's interpretation. Then how can we possibly be confident that if the New York Court of Appeals were considering this question, it would apply the old pre-Restoration Act standard, as opposed to saying, okay, now that we're faced with the question, we're going to apply the liberal construction required by the Restoration Act? Your Honor, I'm merely saying that in this case where the plaintiff is proceeding entirely on her state law claims, and after that oath decision, and after the Simmons decision that she cites to, and Crookendale, the First Department specifically decided to continue to apply the federal standard, that where there's no contrary decision and there's no uncertainty in state law, that certification is not necessary to determine the case before you, nor— Doesn't that lead to some uncertainty as to what the standard would be? It explicitly said, we haven't addressed this issue yet. Well, Your Honor, the Simmons case is followed by the Crookendale case. The First Department appears to have proceeded to conclude that the federal standard remains appropriate for constructive discharge. The recent case of the Second Department, the facts weren't sufficient, didn't warrant reaching the issue. Pardon? You have one more minute. Thank you. So I don't believe that it demonstrates any uncertainty as to the state of the law where the uniform state precedent has proceeded with the federal standard. Although they have recognized that the contours may not be explicitly clear, the standard is a standard adopted under the federal law, and that's the standard that has been applied. And although this case is just—I'm sorry. This case is just not a case where there's an absence of authoritative state court decisions. It's not a case where there's any dispute among the state courts, and it's not a case where it would be outcome determinative, given the facts at bar. In those circumstances, it's appropriate to allow— Oh, what about the outcome determinative? So a moment ago, you said that under the federal standard, courts have said that a reduction in work assignments is not sufficient to force somebody to leave. But if we were—but a more liberal standard that just said, you know, any kind of work conditions that would lead somebody to leave, might it not be premised on a reduction in work assignments? I mean, we just don't know, right? Because we don't have a case that applies that liberal construction to the New York City human rights law. That's correct. We don't have a case, and I didn't hear from a talent really a clear line as to what the more lenient standard would look like here. Although an acknowledgment that it does require more than is required for a hostile work environment. And here, where constructive discharge would be, you know, have enormous consequences on damages, implications for damages, I don't think it's an arena in which the courts would lightly ratchet down the standard, perhaps to the extent that the appellant is suggesting here. Here, I think the most—I don't think the appellant is actually suggesting, or at least I didn't hear, and perhaps he will respond, that the complaints about her work assignments would be sufficient even under a more lenient standard, having acknowledged that it has to be something more than is required for a hostile work environment here. Here, there's nothing in this record that suggests that a reasonable person in Ms. Tolino's situation would have felt compelled to resign. She had available to her union grievance measures, available to her transfers that were offered, Article 78 proceedings, as is court-recognized in Petrosino, where an employee has within their power means to address the conditions. They cannot demonstrate that they're compelled to resign. So under either the forced-to-quit language in the oath decision by the human rights condition or the compelled-to-resign language in the federal condition, the federal standard that the appellant has recognized— Do you agree that if her employer had said, go back to your harasser or you have no future here, that that would meet the standards? Your Honor, I would not concede that under the fact of this case, where she had a permanent civil service title. She was a member of the union. There were no disciplinary proceedings. She could only be terminated for cause. I would not concede that a reasonable person in Ms. Tolino's situation would believe, you know, unlike the facts in Terry v. Oshcraft or Green v. Town of East Haven, where there were either disciplinary proceedings that had been initiated or, in green, wrongdoing that had been found. There was a reason to believe for those employees that they could be fired. Here we have, you know, the jury would—we would have to assume that the jury could credit those statements by Schwartz and Krauss, but all of the other evidence in the record essentially is to the contrary, that she could be forced to quit. For that reason, under— or advancement or new work responsibilities, right? Would that not be enough? Wouldn't—I mean, isn't the point of constructive discharge that it's not an actual discharge? It doesn't require showing that the person was going to be fired by the employer. It shows that the person made the conditions so unpleasant that the person felt that they had to quit themselves. Well, certainly, Your Honor, under this—the court's precedence under the federal standard, the lack of promotional availability or other things of that nature do not meet the federal standard. Your articulation seems ominous to amount to a rule that if you have permanent civil service title, you can't be—quitting is—can't be your only option. Absolutely not, Your Honor. If, in fact, there had been a finding of wrongdoing, as in Green, where the chief of police had found that the employee had stolen items and engaged in duplicity, or if there, in fact, were disciplinary proceedings going forward, these—that would be an entirely different situation here. The civil service protections obviously do not prevent somebody from being fired. They only provide a layer of protection here, where she had exclusively had positive employee evaluations, where there was no ongoing disciplinary proceeding or threat thereof, where there was no finding of wrongdoing or threat of a finding of wrongdoing here. It certainly—it simply is not a case under which a reasonable person in Ms. Tolino's situation would have felt that she was compelled to resign. Thank you, Ms. Paulson. Thank you very much. We'll hear rebuttal. I think a jury could disagree. The plaintiff said on cross that Schwartz told her she would be fired if she tried to leave her current position. That's page 340. She was also told, you have no place here, if you go back to Shehzad Ali. The civil service protections is a very mechanical defense to these statements, because you could say that about any case where somebody is threatened or harassed or discriminated against. Well, you can fire the Title VII lawsuit if things don't go the way you'd like. But, you know, we don't require that of people when they're subjected with an ultimatum like this. There's a logical flaw in the city's arguments and in the district court's analysis, where they try to place the ultimatum in context of what positions might have been available to the plaintiff. The defendants deny giving Michelle Tolino these ultimatums. They were asked about it at trial, and they said, absolutely not. If they deny making these statements to Michelle, how can they then say, but if we made those statements, here's why we would have made them, and here's why she would not have been compelled to resign. The testimony that Michelle gave on direct about these comments, she did not testify, and no one asked her if they were made in the context of other positions that were available to her. She was told, you offended the agency with your complaint about harassment, and if you don't return to work for Ali, you have no place here. That is enough to drive somebody from the workplace. She could not work for somebody like this again. We know what the record shows about what he did and about the culture in that agency, things that were said about her by other people. Why would a woman with her education go back to work at a place like this when she can find work elsewhere? The city law, if it stands for anything, stands for the proposition that you can't force people to work in a work environment that is quite likely to be sexually hostile. The issue about the certain… What about the point about the distinction between a hostile work environment and constructive discharge? You just said you can't force people to work in an environment that is hostile, but that's a hostile work environment claim. So, constructive discharge, wouldn't it show something more than that? It can't be that the two things collapse, or can it? Is that your position? Well, this is not a routine hostile work environment claim. This went on for a long time. If she knows that the harassment is going to resume the way it had left off, I think a jury could find, under any formulation of the city law, that she could leave. Why would somebody subject themselves to further sexual harassment? Excuse me, you have one more minute. When you can work someplace else. These issues that we're all talking about just sound very factual and context-specific. But if the resumption of the sexual harassment is a constructive discharge, then aren't you saying that whenever an EEO complaint isn't resolved to the employee's satisfaction, there's essentially a constructive discharge because she'd be subjected to the conduct she complained about before? Only if they reasonably believe the harassment is going to continue the way it had proceeded before. Basically, if you don't like working for him, leave. Even though he is the one who's been making your life a living hell for the last six years, why should she have to stay there? I mean, there does come a point when somebody is entitled to leave because the work environment can no longer be tolerated. The issue of certainty in state law, we were just hearing that the law is not uncertain in the state appellate courts. Take a look at footnote four from last week in the appellate division's second department. Despite Crookendale, they said the contours of these claims have not been explored yet. And we also heard early in counsel— The federal standard in every case like that, compelling evidence of what the federal courts are in fact going to do. I mean, our job is to predict what the state courts are going to do, not what they should do. Correct, but two answers to that. Number one, if the law is sufficiently unclear, this court, especially with the city law, does certify it to the New York Court of Appeals. And number two, in Golston Green from last week, they said given the limited allegations here, we don't have any reason to explore the contours and consider the degree of difficulty or unpleasantness of working conditions. So they applied the federal standard because the case was not factually compelling enough for them to go there. And we heard a little while ago the city council, when they amended the law, did not cite constructive discharge as an example of why the standard needs to be different. There's cases that address that particular issue. The city council does not have to identify doctrines or precedents that it disagrees with for purposes of guiding courts about how the city law should apply in cases like that. I think that came up in the amendments to the city law in 2016. And so there was a case from the New York Court of Appeals called Toys R Us that was overruled by the city council because the New York Court of Appeals assumed because the city council was not identifying which cases it didn't like. It doesn't mean that all the cases in property interpreting the city law should be interpreted differently. Mr. Bernstein, have any of the state supreme courts written with regard to the issue of a lesser standard on constructive discharge in public opinion? Not that I have seen. Not that I have seen. But even if they did, I think we really need to see what the appellate division is doing, not state supreme. Believe me, having said on the appellate division once in my life, I agree with you. But we don't have an appellate division decision that's applied a different standard yet. And as of this day, haven't. No, we have not. I would agree with that. And wouldn't it seem a bit odd that the last case you mentioned, which is in the 28 day letter, that if the proof wasn't quite up to the federal standard that they that they would have gone ahead and looked at to see if it met a lesser standard on the decision? I think that would have been more forgiving. One would have thought that they would look to the lesser standard if they thought one was good. I suppose the appellate division could have said the plaintiff has no claim, but here's the contours of constructive discharge claim anyway. But I guess for whatever reason and their discretion, they didn't do that. They could have done it, but they didn't. Okay. All right. Thank you, Mr. Bernstein. Thank you, Mr. Bernstein and Ms. Paulson. Very, very nicely argued. Thanks, everyone. In unusual circumstances, nicely argued on both sides. Thank you.